UNITED STATES, Appellee,

v.

Keith FORBES, Defendant, Appellant.

No. 98–2302.

United States Court of Appeals,
First Circuit.

Heard May 3, 1999.

Decided May 24, 1999.

David N. Cicilline for appellant.

Kenneth P. Madden, Assistant United States Attorney, with whom Margaret E. Curran, United States Attorney, was on brief, for appellee.

Before TORRUELLA, Chief Judge, STAHL and LYNCH, Circuit Judges.

STAHL, Circuit Judge.

Defendant-appellant Keith Forbes appeals his convictions for possession of cocaine with intent to distribute and possession of marijuana with intent to distribute, both in violation of 21 U.S.C. § 841. He claims that the court erred in denying his motion to suppress evidence seized during a warrantless search of his automobile. We vacate the order denying the motion to suppress and remand for further proceedings.

## I.

After a warrantless search of his automobile, Forbes, a Jamaican immigrant,

was arrested and charged with two counts of violating 21 U.S.C. § 841(a)(1) and (b)(1). During a hearing on July 2, 1998, the district court denied Forbes's motion to suppress evidence derived from the search. Forbes pleaded guilty to the two counts, but reserved the right to appeal the court's order denying his motion to suppress. The court sentenced Forbes to, *inter alia,* 57 months' imprisonment.

Because the facts are in dispute, and because this appeal largely turns on whether the court made improper factual findings, we recite both the government's and Forbes's versions of the facts as they emerged during the suppression hearing, followed by the court's findings.

## A. The Government's Version

Rhode Island State Trooper Terrence Pendergast, the officer who conducted the search in question, testified as follows. On April 1, 1998, Forbes was driving a black BMW with Massachusetts plates and tinted windows northbound on Route 95 near West Greenwich, Rhode Island. Pendergast clocked Forbes driving seventy-five miles per hour in a sixty-five miles per hour zone. After noting that Forbes was speeding, Pendergast followed directly behind Forbes in a marked police car without turning on his lights or siren. Forbes then began shifting from lane to lane without putting on his turn signal. At this point, Pendergast put on his lights and pulled Forbes over.

Pendergast walked to the car, and Forbes lowered the driver's side window. Pendergast saw smoke coming from the window and smelled burning marijuana. When he asked Forbes if he had any more marijuana in his possession, Forbes replied, "No. I don't have any more marijua-na. I had just finished smoking a roach." Pendergast took Forbes's license and registration, and ran a criminal history check on them. The check showed Forbes's papers to be valid and did not reveal that Forbes had a criminal record,[1] but Pendergast nonetheless retained the documents.

Pendergast next asked Forbes if he would consent to a search of the vehicle, and Forbes acquiesced. Although Pendergast had written consent forms in his cruiser, he did not give Forbes one. Pendergast did not think he needed written consent, or for that matter, any consent, because he believed he had probable cause to search the vehicle anyway.

Pendergast asked Forbes to step out of the car, did a *Terry* frisk of his person, and removed a pack of rolling papers and a wallet from his pockets. After another officer arrived, Pendergast searched Forbes's vehicle. Pendergast saw what appeared to be at least a dozen marijuana seeds in the ashtray.

Pendergast then asked Forbes how to open the trunk, and Forbes replied that you need to use the car key.[2] Pendergast removed the key from the car, handed Forbes the key, and asked him to open the trunk. Forbes willingly did so. Within the trunk were two zipped duffel bags, which smelled of unburned marijuana and acetone.[3] Pendergast unzipped and searched the bags. The first duffel bag contained cocaine. After finding the cocaine, Pendergast handcuffed Forbes and read him his *Miranda* rights. Pendergast then opened the second duffel bag, which contained marijuana. Pendergast drove Forbes back to the police station.

## B. Forbes's Version

Forbes's version of the events in question is decidedly different. Forbes was

---

1. Although the computer check failed to turn up a previous record, Forbes had been arrested and prosecuted before. On that occasion, however, Forbes gave the police and the court a false name. The government impeached Forbes at the suppression hearing by eliciting Forbes's admission that he had used a false name.

2. Meanwhile, a third trooper arrived on the scene.

3. Acetone is sometimes used to dilute cocaine.

not driving seventy-five miles per hour; he knew that the overpass where Pendergast was waiting was a common speed trap, so he was careful at that section of the highway. Nor did Forbes swerve from lane to lane. After being pulled over, Forbes asked Pendergast why he had been stopped, and Pendergast replied that his windows were too dark.

Pendergast initially asked Forbes for his license and registration. Pendergast took the papers to check them and, returning to the car, asked Forbes to step out of the car. Pendergast frisked Forbes, and then asked him whether he had any drugs or weapons. Forbes answered, "No." Forbes did not ever smoke marijuana in the car and had not smoked marijuana that day. He had, however, smoked a cigar in the car that morning, and there was an empty cigar packet on the floor of the car.

Pendergast then told Forbes to wait in his car, and Pendergast returned to his cruiser. A second police car arrived. Pendergast told Forbes to back up his car, leave his key in the ignition, and again step out of the car. Pendergast searched Forbes's pockets (removing the wallet and the rolling papers), and subsequently began to search Forbes's car without asking for, or receiving, consent. Forbes testified that he never would have consented to a search of the car, because he knew that there were drugs in the trunk. After completing his search of the car, Pendergast took Forbes's key and opened the trunk.

Supporting Forbes's version of events, a laboratory test performed on the contents of Forbes's ashtray revealed no traces of drugs. Nor did there appear to be "seeds" of any kind in the ashtray; the toxicologist's report made no reference to seeds, and Pendergast admitted during the hearing that he could not discern any seeds in

the toxicologist's exhibit, which was taken from the ashtray.

## C. The District Court's Findings

In making its findings, the district court explicitly stated that

if I was just looking at a cold record here, I wouldn't believe the Government's version .... But I must say after listening to the testimony of Trooper Pendergast, and observing him when he testified, the version as difficult as it may seem to believe on paper, seems to me to be credible as related by him.

The court believed that Pendergast "smelled what he thought was burning marijuana," though the smell may not have actually been marijuana. Similarly, the court stated that, although "based on the evidence that's been presented, there probably were not marijuana seeds in the ash tray[,][t]hat doesn't mean that Trooper Pendergast might not have thought he saw them." The court also found that it was Forbes who opened the trunk of the car. Most importantly for present purposes, the court determined that Forbes voluntarily gave his consent to the search.

Yet despite the court's contention that it found Pendergast to be credible, the court called into question or rejected some major parts of Pendergast's testimony. It found that Forbes was speeding, but remarked, somewhat ambiguously, that Pendergast's claim he was swerving from lane to lane was "probably a little window-dressing that was added on." Moreover, the court found that when asked if there was marijuana in the vehicle, Forbes simply answered, "No."[4] The court thus rejected Pendergast's "roach" testimony.[5]

On appeal, Forbes argues that the district court erred in its determination that

---

4. The court also had earlier stated that "it seems difficult to accept that the Defendant would have told the trooper stopping him that he just finished smoking a roach."

5. The court not only found some of Pendergast's testimony to be unbelievable, but also

determined that Pendergast did not always follow proper police procedure. It stated: "For some inexplicable reason, [Pendergast] also took Mr. Forbes' wallet from his rear pocket [during the frisk]. That is a little difficult to justify under the circumstances."

he gave valid consent to the warrantless search of his automobile. The government counters that there was no error and also contends that, even if the court did err in finding valid consent, there was probable cause to support a search of the vehicle without consent.

## II.

A warrantless search violates the Fourth Amendment unless it comes within one of the "few specifically established and well-delineated exceptions" to the warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). A consensual search is one such exception. *See id.* To establish applicability of the consent exception, the government must prove valid consent by a preponderance of the evidence. *See United States v. Schaefer*, 87 F.3d 562, 569 (1st Cir.1996).

Forbes makes three alternative arguments as to why the court erred in finding valid consent: (1) the facts, as found by the district court, do not support the conclusion that Forbes's consent to search was voluntary; (2) even if his consent to search the car was voluntary, Forbes did not consent to a search of the bags in the trunk; or (3) the court erred in its factual finding that Forbes consented to the search at all. We will address each argument in turn.

## A.

First, Forbes contends that even if we were to assume that the facts as found by the district court are supportable, the court erred in its ultimate conclusion that Forbes's consent was voluntary. *See Ohio v. Robinette*, 519 U.S. 33, 40, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (stating that, to be valid, consent to a search must be voluntary). The determination of voluntariness "turns on an assessment of the totality of the circumstances." *United States v. Barnett*, 989 F.2d 546, 554–55 (1st Cir.1993). The court should take into account factors such as the consenting party's "age, education, experience, intelligence, and knowledge of the right to withhold consent." *Id.* at 555. Further considerations "include whether the consenting party was advised of his or her constitutional rights and whether permission to search was obtained by coercive means or under inherently coercive circumstances." *Id.* We review a determination that consent was voluntary for clear error. *See id.* at 556.

Forbes points to several factors that weigh against a finding of voluntary consent: (1) there was no written consent; (2) Forbes was not advised of his right to refuse consent; (3) he was not free to leave (as Pendergast retained possession of his license and registration); and (4) as a native of Jamaica, Forbes may have had little knowledge of the extent of his rights. In contrast, weighing in favor of the court's finding of voluntariness are the facts that (1) there was only one officer present at the time Forbes's consent was sought; (2) Pendergast did not show his gun to Forbes; (3) Forbes was not handcuffed; (4) Forbes was not yet arrested and was not in a custodial setting; and (5) the district court found that Forbes was willing and very cooperative. *Cf. id.* at 555–56 (consent was voluntary even though defendant was met at the door of his home by seven or eight law enforcement officers with guns drawn, was arrested and handcuffed, and was not informed that he could withhold consent). Furthermore, there was no showing that Forbes's foreign background made him unfamiliar with his legal rights; on the contrary, his criminal record, *see supra* note 1, indicates that he had previous dealings with law enforcement officers.

If we assume *arguendo* that the district court's factual findings are supportable, it would be difficult to rule that the district court clearly erred in determining that Forbes's consent was voluntary. In a very similar situation, the Supreme Court determined that the defendant made an "es-

sentially free and unconstrained choice because his will ha[d][not] been overborne and his capacity for self-determination [was not] critically impaired." *United States v. Watson,* 423 U.S. 411, 424, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) (first alteration in original) (citation and internal quotation marks omitted). In *Watson,* the Court found it significant that there was no overt act or threat of force, no promises made to the defendant, and no "subtle form[ ] of coercion that might flaw his judgment." *Id.* Although the defendant "had been arrested and was in custody," he gave his consent "while on a public street, not in the confines of a police station." *Id.* The Court emphasized that the fact of custody alone is never enough to demonstrate coerced consent. *See id.* Furthermore, the Court was not persuaded by the fact that there was an absence of proof that the defendant knew he could withhold his consent; the Court stated that while this is a factor, it does not have controlling significance. *See id.* The Court concluded:

> There is no indication in this record that [the defendant] was a newcomer to the law, mentally deficient, or unable in the face of a custodial arrest to exercise a free choice. He was given *Miranda* warnings and was further cautioned that the results of the search of his car could be used against him. He persisted in his consent.

*Id.* at 424–25, 96 S.Ct. 820 (footnote omitted).

 The only differences between the present case and *Watson* are that Forbes was not arrested, was not given *Miranda* warnings, and was not told that the results of the search could be used against him.

Though the last difference is an important one, we think it significant that Forbes's own testimony indicates that he knew that the search could be used against him. Specifically, he stated that he would not have consented to a search because he knew that there were drugs in the car. Therefore, we believe that this case is ultimately indistinguishable from *Watson.* Thus, if we assume the correctness of the court's finding that consent existed, *but see infra* Part II.C., we could not say that the court was clearly erroneous in determining that such consent was voluntary.[6]

**B.**

 Forbes also argues that even if he consented to a search of the car, he did not voluntarily consent to a search of the zipped bags in the trunk. The relevant inquiry is "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). Assuming again that the court's factfinding was correct, it is reasonable to construe Forbes's consent to search the automobile as encompassing consent to search the trunk. *See United States v. Zapata,* 18 F.3d 971, 977–78 (1st Cir.1994) ("[A]ppellant's general consent to a search of the automobile constitute[s] consent to a search of the [unzipped] duffel bags [in the trunk]."). Moreover, the court found that Forbes opened the trunk for Pendergast, thereby reiterating his agreement to search the trunk. *Cf. United States v. Miller,* 589 F.2d 1117, 1131 (1st Cir.1978) (unlocking a vehicle may itself be enough to support an inference of consent).

---

**6.** Forbes makes two other arguments as to why the court erred in its determination that his consent was valid. First, he suggests, in a few undeveloped sentences, that his detention was unreasonably prolonged, and that this lengthy detention negated his consent. Forbes did not raise this argument below, however, and thus has forfeited it. *See United States v. Lopez,* 147 F.3d 1, 6 (1st Cir.1998). Second, Forbes contends that Pendergast's

illegal removal of his wallet during a *Terry* frisk convinced him that Pendergast would search his possessions with or without his permission, and that any withdrawal of his consent would therefore be pointless. We are unconvinced, however, that the mere act of taking Forbes's wallet would so overbear Forbes's will that his failure to withdraw his consent should be deemed involuntary.

Therefore, if Forbes consented to a search of the car, he also consented to a search of the trunk. A reasonable person also would expect that a general consent to search a vehicle, including the trunk, would extend to duffel bags within that vehicle or trunk. *Cf. Zapata,* 18 F.3d at 977 ("[A] general consent to search a motor vehicle subsumes the specific consent to search any easily accessible containers within the vehicle."). But even if consent did not extend to the duffel bags, Pendergast's uncontested testimony that the bags smelled of unburned marijuana and acetone would give him probable cause to search the bags. *See United States v. Staula,* 80 F.3d 596, 602 (1st Cir.1996) (olfactory evidence may furnish a law enforcement officer with probable cause to search a confined area). Thus, if Forbes consented to a search of his car, the search of the duffel bags in his trunk was proper.

### C.

 Finally, Forbes argues that the district court erred in its factual finding that he consented to a search of his vehicle. Although we also review for clear error the district court's finding that there was a consent-in-fact to search, *see Miller,* 589 F.2d at 1130, our review is more deferential when it comes to the court's findings of historical facts, which depend upon assessments of witness credibility. "Credibility determinations by the trier of fact are accorded special deference," *United States v. Bouthot,* 878 F.2d 1506, 1514 n. 8 (1st Cir.1989), particularly because only the trial court can judge a witness's demeanor or tone of voice, *see United States v. Carty,* 993 F.2d 1005, 1009 (1st Cir.1993) (citing *Anderson v. Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). Nonetheless,

> [t]his is not to suggest that the trial judge may insulate his findings from review by denominating them credibility determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness.

Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination.

*Anderson,* 470 U.S. at 575, 105 S.Ct. 1504.

 Here, the court's findings are indeed troubling. We do not wish to substitute our judgment for that of the district court, but we are concerned that this is a case where an affirmance without further record development would endorse the very insulation warned against in *Anderson.* The government had the burden of proof: it needed to show consent by a preponderance of the evidence. Yet the court itself stated that the government's version of events looked improbable on the record. As the court acknowledged, it would seem unlikely that Forbes, an individual not unfamiliar with the criminal justice system, would consent to the search of an automobile that he knew to contain drugs. The court therefore rested its findings solely on the credibility of Pendergast. Such credibility is questionable after the court rejected one aspect of the officer's testimony and characterized another as "window-dressing that was added on." The court did not explain why it found Pendergast to be credible on the consent issue but incredible on the issue of Forbes's alleged admission about smoking the roach. Nor did the court reconcile its consent finding with its apparent determination that Pendergast's lane-changing testimony involved a measure of embellishment. We emphasize that Pendergast's testimony is not entitled to increased deference merely because he is a police officer. *Cf. United States v. Victoria–Peguero,* 920 F.2d 77, 84 (1st Cir.1990) ("Where government agents are apt to be key witnesses, the trial court ... should ordinarily make inquiry into whether prospective jurors are inclined to have greater faith in the agents' testimony merely by virtue of their official positions.").

Moreover, there is evidence that would tend to contradict Pendergast's testimony with respect to Forbes's consent. Pendergast failed to · use the written consent forms which he had. Furthermore, Pendergast gave no explanation as to why he asked for Forbes's consent at all, given that he did not believe consent was necessary.[7] And physical evidence presented at the hearing—the contents of Forbes's ashtray—tends to contradict Pendergast's story on another crucial point: whether he saw any marijuana seeds in Forbes's ashtray. Without further explanation as to why Pendergast's testimony with respect to consent is sufficient to meet the government's burden, despite the improbability of Pendergast's story, the indications that Pendergast was an unreliable witness in other respects, and the fact that extrinsic evidence tends to call into question his testimony, we would have a "definite and firm conviction that a mistake has been committed." *Interstate Commerce Comm'n v. Holmes Transp., Inc.*, 983 F.2d 1122, 1129 (1st Cir.1993) (stating that such a conviction is reason to find clear error). Because we find ourselves without a sufficient explanation for the court's ultimate conclusion, we are uncertain whether a mistake has been committed. We therefore remand to the district court so that it may clarify and amplify the reasons for its factual findings or, perhaps, reconsider its conclusion.

### III.

■ The government argues that even if the district court erred on the · issue of consent, we should nonetheless affirm the conviction because Pendergast had probable cause to search the automobile. The district court, however, never considered the government's probable cause argument and therefore made no factual findings on the issue. Moreover, the record as it stands does not compel a finding of probable cause. Therefore, we cannot affirm on this basis. If the court below should determine that it erred on the issue of consent, it should then make the necessary findings regarding probable cause.

### IV.

Accordingly, we *vacate* the order denying the motion to suppress evidence and *remand* to the district court for further proceedings consistent with this opinion.

---

7. Forbes's counsel asked Pendergast the following series of questions during the suppression hearing:

 Q.: Did you believe that you had to ask permission for Mr. Forbes to search the interior of his car, yes or no?

 . . . . .

 Q.: But you did. You didn't believe you had probable cause yet, did you?

 . . . . .

 A.: No, I believed I did have probable cause.

 Q.: But you just asked him to be a nice guy?

 Q.: You asked him because you wanted to be sure you had his permission to go into his car?

 Q.: That's all I have, Judge.