# United States Court of Appeals

## For the First Circuit

No. 05-2077

UNITED STATES OF AMERICA,

Appellee,

v.

EDDIE COPLIN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Torruella, Selya and Dyk,** Circuit Judges.

Bernard Grossberg for appellant.
Randall E. Kromm, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for appellee.

September 20, 2006

*Of the Federal Circuit, sitting by designation.

**SELYA**, **Circuit Judge**.  This appeal hinges on an interesting and important point in the jurisprudence of the Fourth Amendment: does reasonable suspicion, based on a plausible but mistaken view of the facts, justify a Terry stop?  The district court answered this question in the affirmative, and so do we. Consequently, we uphold the district court's denial of the defendant's motion to suppress.  We also reject, more easily, the defendant's remaining claims of error, which challenge the district court's regulation of cross-examination and its sentencing protocol.

## I.  BACKGROUND

We rehearse the facts as the district court found them, consistent with record support.  See United States v. Romain, 393 F.3d 63, 66 (1st Cir. 2004).

On July 1, 2002, the Boston police were intensifying their patrol of the Grove Hall neighborhood in response to a recent incident of gun violence.  Just before 4:45 p.m. on that date, Officers Scott O'Brien and Steven Rioux spotted a Honda Accord and decided to run a check of its license plate because, as Officer O'Brien later testified, Hondas are stolen with more frequency than virtually any other make of automobile.

In Boston, police cruisers are commonly equipped with mobile data terminals (MDTs).  These MDTs are linked to various databases including those of the Massachusetts Registry of Motor

Vehicles and the National Crime Information Center. Officer O'Brien entered the Honda's license plate number into the MDT and, according to both officers, the MDT indicated that the owner of the car had a suspended driver's license.

The officers pulled up behind the Honda near the corner of Blue Hill Avenue and Quincy Street. O'Brien disembarked from the cruiser and approached the driver's-side door of the Honda, while Rioux approached the passenger's-side door. O'Brien confirmed that the operator of the vehicle, defendant-appellant Eddie Coplin, was the vehicle's owner. He then asked the defendant to disembark. As the defendant exited the vehicle, he tried to keep his right hand out of view and close the door behind him. During that process, O'Brien spied a gun on the driver's seat. O'Brien immediately placed the defendant under arrest and instructed Rioux to handcuff him.

When this transpired, the passenger in the stopped car, Sheila Fuentes, became visibly agitated, started to move into the driver's seat, and disregarded the officers' instruction to keep her hands in sight. In response, the police handcuffed her as well. Subsequent searches revealed eleven baggies of marijuana in Fuentes's purse and a sack of cocaine base in her lingerie.

Following his detention, the defendant insisted that he held a valid driver's license. O'Brien re-entered the license plate number into the MDT and showed the defendant a screen that

indicated the suspended license.  At that point, however, O'Brien noticed, apparently for the first time, a screen indicating that the defendant's license was in full force.

## II.  TRAVEL OF THE CASE

In due season, a federal grand jury indicted the defendant on various firearms and drug charges involving the items that the police had retrieved from the car and from Fuentes's person.  The defendant moved to suppress these items, challenging the constitutionality of the initial traffic stop.

The district court held a two-day evidentiary hearing on the motion to suppress.  Officers O'Brien and Rioux testified about the events surrounding the stop and the ensuing arrest.  Neither officer recalled having seen an active license indicator prior to initiating the stop.  The government also presented the testimony of Officer Vincent Stancato, a technical trainer in the police department's information technology division.  Stancato provided background information on the workings of the MDT system and its wonted use within the police department.

Pertinently, Stancato testified that after a query (such as a license plate number) is entered into an MDT unit, data from the networked databases filter back to the unit at varying speeds.[1] The MDT unit displays the information it receives in the form of

---

[1]Speed depends on a miscellany of factors, such as whether a given database is busy fielding other inquiries from other requesters.

successive screens. The data reflected in the later screens supersede — that is, are more accurate and, hence, more reliable than — the data reflected in the earlier screens.

In order to receive the updated information screens, a user is prompted to hit a "next message" button. Using this modality, every officer is trained to scroll through successive data screens in order to reach the most up-to-date information about the subject matter in question. O'Brien testified that he had done exactly that.

With respect to the MDT query in this case, the district court admitted into evidence a printout from the MDT system. The printout tracked the flow of data beginning with O'Brien's initial entry of the license plate number at 4:45 p.m. (recorded as time 16:45:44) on the afternoon of July 1, 2002.[2] The MDT printout indicated that five and six seconds later (that is, at 16:45:49 and again at 16:45:50), the data flow indicated that the car's owner had an active driver's license. Instantaneously thereafter, also at 16:45:50, the printout indicated a suspended license. While Officer Stancato could not determine from the printout whether O'Brien and Rioux actually had seen the earlier screens indicating

_____

[2]It is clear that this printout, which was offered into evidence by the defendant, is not identical in format to the display the officers would have seen at the time the events unfolded; it did, however, track the sequence in which the data about the defendant and his vehicle would have been received by the officers' MDT unit.

a valid driver's license, he testified that based on how the system works the officers would have had to scroll through the earlier screens in order to reach the later-received screen that reported a suspended license (the information upon which the officers based the stop).[3]

At the conclusion of the hearing, the district court ruled from the bench. Relying on Whren v. United States, 517 U.S. 806 (1996), the court found that the police department's decision to target the Grove Hall area and focus its attention on "high-risk vehicles" was within the enceincture of its discretion. As to the stop itself, the court found it likely that Officer O'Brien had "conflated the information that he had" by making "the suspension the only observation with respect to the license." This conflation, whatever its source, did not trouble the court because "even if [O'Brien] saw both" license entries, he "did focus on what was the ultimate determination here that justified the stop. And that is that it was a suspended license." The court found O'Brien's testimony credible and his actions reasonable, given that events were unfolding rapidly in "realtime." Indeed, the printout

_____

[3]At the suppression hearing, there was conflicting testimony as to whether the active screen or the suspended screen appeared first. Officer O'Brien testified that "it c[a]me up suspended first and then active." However, the MDT printout and Officer Stancato's testimony both indicated that the active screen would have appeared before the suspended screen. Since the district court reasonably credited the latter evidence, we will assume for purposes of this appeal that the active screen was displayed first.

reveals that there was a delay of only one second between the initial screen showing an active license and the later screen showing a suspended license.

The district court concluded that the officers had reasonable suspicion to stop the defendant's car in order to investigate whether the driver was operating on a suspended license. This reasonable suspicion justified the initial stop, and the combination of the defendant's behavior, the sighting of the gun, and Fuentes's antics collectively justified the arrest and the ensuing searches.

After the district court denied his motion to suppress, the defendant entered a conditional plea of guilty to each of the four counts contained in the superseding indictment, reserving his right to appeal the suppression ruling. See Fed. R. Crim. P. 11(a)(2). The district court thereafter sentenced the defendant to an aggregate incarcerative term of 180 months: 120 months on count 2, 60 months on each of counts 1 and 3 (to run concurrently with each other and with the sentence on count 2), and 60 months on count 4 (to run consecutively to the terms imposed for the other three counts). This appeal followed.

## III. DISCUSSION

The defendant assigns error to the district court's refusal to suppress, its regulation of cross-examination, and its

sentencing protocol.   We discuss these claims of error sequentially.

## A.  Refusal to Suppress.

The defendant's challenge to the district court's denial of his motion to suppress is narrowly focused.  The main thrust is directed to the validity of the stop itself.   The applicable standards of review are familiar.  In considering the denial of a motion to suppress, we accept the trial court's findings of fact unless they are clearly erroneous and subject its conclusions of law to de novo review.  Ornelas v. United States, 517 U.S. 690, 699 (1996); Romain, 393 F.3d at 68.

It is axiomatic that a brief investigatory stop "constitutes a seizure within the purview of the Fourth Amendment and, therefore, is subject to the constitutional imperative that it must be reasonable under all the circumstances."  Romain, 393 F.3d at 70-71 (citing Terry v. Ohio, 392 U.S. 1 (1968)).  An officer may conduct such a stop if he has a "reasonable, articulable suspicion that criminal activity is afoot."  Id. at 71.  The officer's initial actions must be justified at their inception and his subsequent actions must be "responsive to the emerging tableau — the circumstances originally warranting the stop, informed by what occurred, and what the officer learned, as the stop progressed." United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001).   These benchmarks require us to assess the totality of the circumstances,

on a case-specific basis, in order to ascertain whether the officer had a particularized, objectively reasonable basis for suspecting wrongdoing (and, thus, for making the initial stop). United States v. Arvizu, 534 U.S. 266, 273 (2002).

In this instance, the district court placed heavy emphasis on the MDT data and the protocols for interpreting the data as described by Stancato (the training officer). Stancato explained that police officers are trained to focus on the superseding, more accurate, data that populate the MDT screen, and the district court found that this orientation (favoring reliance on later-arriving data) animated the officers' initiation of the stop. While blind deference to the perceptions of officers deciding whether to undertake a stop is inappropriate, deference is due to objectively reasonable perceptions. See, e.g., United States v. Woodrum, 202 F.3d 1, 7 (1st Cir. 2000). Given that the suspended screen arrived after the active screen and thereafter continued to indicate that the defendant's license was suspended, we cannot fault the district court's determination that Officer O'Brien's suspicion was objectively reasonable.[4]

---

[4]The defendant does not challenge the officers' implicit assumption that the owner and operator of the Honda were one and the same. This assumption has grounding in the case law, see, e.g., West v. Duncan, 179 F. Supp. 2d 794, 803 (N.D. Ohio 2001); Commonwealth v. Deramo, 436 Mass. 40, 43, 762 N.E.2d 815, 818 (2002), and we therefore do not question it.

The fact that, as matters turned out, the defendant's license was not suspended at the time of the stop — a fact that the government conceded for purposes of the suppression motion — does not alter this assessment. To be sure, O'Brien's reliance on the computer database record indicating a suspended driver's license constituted a mistake, regardless of whether, in initiating the stop, he relied solely upon the suspension information or acted upon a conflation of the conflicting responses. But there is no dispute in this case that driving with a suspended license would be a violation of Massachusetts law. See Mass. Gen. Laws ch. 90, §§ 10, 21, 23. The mistake was, therefore, one of fact, not of law.

This dichotomy is important because of the material difference between traffic stops based on a police officer's mistake of law and those based on a police officer's mistake of fact. Stops premised on a mistake of law, even a reasonable, good-faith mistake, are generally held to be unconstitutional. See, e.g., United States v. McDonald, 453 F.3d 958, 961-62 (7th Cir. 2006) (holding stop invalid where statute did not proscribe defendant's use of the turn signal); United States v. Chanthasouxat, 342 F.3d 1271, 1277-80 (11th Cir. 2003) (finding no reasonable suspicion where applicable code did not require inside rear-view mirrors). But see United States v. Martin, 411 F.3d 998, 1001 (8th Cir. 2005) (stating that "in mistake cases the question is simply whether the mistake, whether of law or fact, was an

-10-

objectively reasonable one" (citation and internal quotation marks omitted)).

Stops premised on mistakes of fact, however, generally have been held constitutional so long as the mistake is objectively reasonable.  See, e.g., United States v. Miquel, 368 F.3d 1150, 1153 (9th Cir. 2004); United States v. Cashman, 216 F.3d 582, 587 (7th Cir. 2000).  A finding of reasonable suspicion demands only an objectively reasonable appraisal of the facts — not a meticulously accurate appraisal.

With respect to the significance of the mistake of fact in this case, we draw upon our analysis in United States v. Fox, 393 F.3d 52 (1st Cir. 2004).[5]  There, a police officer initiated an investigatory stop when he was unable to determine whether a vehicle driven by the defendant had a functioning license plate light (which he knew to be required under Maine law).  Id. at 56, 59.  The defendant challenged this stop based on the testimony of the vehicle's owner that she checked the plate light soon after the stop and found it in good working order.  We rejected that challenge, concluding that the stop was lawful because, whether or not mistaken, the officer "reasonably believed . . . that the plate light was not functioning."  Id. at 59 n.6.

_____

[5]The Supreme Court vacated the decision in Fox on a sentence-related ground.  125 S. Ct. 2949 (2005).  The original sentence was then affirmed on remand.  See 429 F.3d 316 (1st Cir. 2005).  None of this affects the validity of the Fox court's Fourth Amendment ruling.

<u>Fox</u> stands for the proposition that an objectively reasonable suspicion, even if found to be based on an imperfect perception of a given state of affairs, may justify a <u>Terry</u> stop. So it is here.[6]  It is unclear why the MDT screen inaccurately indicated a suspended license after having correctly indicated an active license.  Whether or not the defendant was driving with a suspended license, however, the fact that the officers, in line with the guidance they had received for interpreting the MDT screens, reasonably believed that his license was suspended adequately grounded their initiation of the stop.  Accordingly, we uphold the district court's determination that the officers predicated the stop on an objectively reasonable suspicion.  <u>See</u> <u>Miquel</u>, 368 F.3d at 1154 (affirming denial of motion to suppress where, even though the vehicle registration had not in fact expired, "the deputies did not have any reason to question the integrity of the information provided by the Arizona Motor Vehicle Department").

---

[6]The fact that here, unlike in <u>Fox</u>, the mistake emanated from a government record raises a potential concern under <u>Arizona</u> v. <u>Evans</u>, 514 U.S. 1, 6 (1995) (considering suppression of evidence seized incident to arrest based on erroneous police record).  In this case, however, any argument under <u>Evans</u> is waived.  <u>See</u> <u>Sandstrom</u> v. <u>ChemLawn Corp.</u>, 904 F.2d 83, 86 (1st Cir. 1990) (holding that an argument "not made to the district court or in appellant's opening brief, [but] surfacing only in his reply brief" was waived); <u>see</u> <u>also</u> <u>United States</u> v. <u>Slade</u>, 980 F.2d 27, 31 (1st Cir. 1992) (explaining that "a party is not at liberty to articulate specific arguments for the first time on appeal simply because the general issue was before the district court").

This does not end our odyssey. At oral argument before us, the defendant, for the first time, launched a preemptive strike aimed at the scope of the stop. The burden of this freshly minted plaint runs as follows: at best, the officers had ambiguous, rather than sure-fire, information about the status of the driver's license, so they had leeway only to request production of the license, not to order the defendant out of the car. Because this argument was neither presented to the district court nor briefed on appeal, it is forfeited, if not entirely waived.[7] See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). In all events the argument is meritless.

Under Pennsylvania v. Mimms, 434 U.S. 106 (1977), and its progeny, a police officer may, as a matter of course, require the driver of a car lawfully stopped for a suspected traffic violation to step out of his vehicle. Id. at 111 & n.6; cf. Maryland v. Wilson, 519 U.S. 408, 414-15 (1997) (permitting officers to order passengers out of car during traffic stop even though passengers are not suspected of having committed a crime). That rule is grounded in legitimate concerns for officer safety — and it is dispositive here. Since the stop was lawful, it follows inexorably

---

[7]We say "waived" because, in the course of argument before the district court, the defendant's trial counsel vouchsafed that as long as the stop was lawful, "I would have to certainly believe that everything thereafter, both the search and the statements, would probably come in . . . . [M]y argument is clearly directed at the beginning, not at the end."

that the officers were authorized, as a security measure, to order the driver out of the car pending the completion of their investigation into the suspected traffic violation.

## B. **Curtailment of Cross-Examination**.

As part and parcel of his attack on the district court's denial of the motion to suppress, the defendant contends that the court unfairly curtailed his cross-examination of Officer Rioux during the suppression hearing. This assignment of error relates directly to the district court's ruling on suppression and, thus, comes within the constellation of issues preserved for appeal under the terms of the conditional guilty plea. See United States v. Link, 238 F.3d 106, 108-11 (1st Cir. 2001). We approach this topic mindful that rulings admitting or excluding evidence, such as rulings regulating the scope and extent of cross-examination, are reviewed only for abuse of discretion. See United States v. Balsam, 203 F.3d 72, 87 (1st Cir. 2000).

In mounting this argument, the defendant directs our attention to the following series of questions posed to Rioux by defense counsel (page references are to the MDT printout introduced into evidence):

> Q And it says that Mr. Copeland's license is active; is that correct?
>
> A That is what it says.
>
> Q Is there any reason at that point that you were concerned that "I need to stop this vehicle?"

-14-

A It came back suspended at that time.

Q No, I didn't ask you that.

MR. CHIPMAN [Defense Counsel]: I'll ask that be stricken from the record, Your Honor.

THE COURT: No. You asked the question. You got the answer.

Q Again, Officer, on page six at the bottom, it says Mr. Copeland's license is active; is that correct?

A It says it.

Q That's what it says. At that point in time, was there any reason to believe that he was operating without a valid license?

MR. KANWIT [Prosecutor]: Objection, Your Honor. Again, we're confusing the exhibit.

THE COURT: Please. You asked the question of the witness. But I'll tell you, this is not particularly productive. I go over and look at the suspended license report and it's precisely the same time. 16:45:50 seconds. The question I want to know is does the screen always show what the printout shows. And I don't know if this witness can answer it or if anybody can answer it. But in any event, this is spelling banana, but refusing to stop.

MR. CHIPIMAN: Well, I have no further questions of this witness, Your Honor.

On appeal the defendant attempts to characterize the district court's comments as a "blanket restriction" on a line of questioning. Building on this porous foundation, he posits that, therefore, "the issue of whether the officers had reason to believe that the defendant was operating without a license at the precise

moment of the stop was not developed." We reject this jerry-built construct.

As an initial matter, the full transcript of Officer Rioux's testimony shows beyond hope of contradiction that the court allowed the defendant to cross-examine the officer at length on his interpretation of the MDT printout. Moreover, the specific passage to which the defendant adverts, quoted above, does not reflect any curtailment by the district court of this expansive cross-examination. Rather, it reflects only that, after the government renewed an earlier objection, the court remarked the obvious — that the line of questioning was "not particularly productive." This normative observation did not constitute a curtailment.[8]

If more were needed — and we do not think that it is — the line of inquiry pursued by the defendant worked backward, from Officer Rioux's interpretation of the MDT printout while on the witness stand to establishing what his beliefs may have been while at the scene. To the extent that the defense counsel sought to inquire about Officer Rioux's subjective beliefs, the responses that the cross-examination was designed to elicit were not especially probative of the basis for the stop (which, after all,

_____

[8]We note that, even if it did, defense counsel made no offer of proof. Any claim of curtailment was, therefore, waived. See Fed. R. Evid. 103(a)(2) (requiring offer of proof in most cases following ruling excluding evidence for preservation of objection); see also United States v. Jadusingh, 12 F.3d 1162, 1166 (1st Cir. 1994) (applying the rule).

-16-

depended on objective reasonableness, not on subjective impressions, see Whren, 517 U.S. at 813). Given the undeniable authority of trial courts to place reasonable limits on cross-examination in order to cut off protracted discussion of marginally relevant subjects, see United States v. Jimenez-Torres, 435 F.3d 3, 11 (1st Cir. 2006); United States v. Mikutowicz, 365 F.3d 65, 72 (1st Cir. 2004), it would have been well within the district court's discretion to limit the line of inquiry undertaken here.

The defendant's reliance on United States v. Forbes, 181 F.3d 1 (1st Cir. 1999), is misguided. There, the trial judge denied the defendant's motion to suppress, finding the testimony of the police officer credible even though the judge (i) questioned or rejected major aspects of that testimony and (ii) determined that the officer had not always followed proper police procedures. Id. at 4 & n.5. We remanded in light of these inconsistencies because the court had "rested its findings solely on the credibility of [the officer]." Id. at 7. Here, however, the district court did not find the officers' testimony fraught with error, did not rely solely on their credibility, and did not determine that they had deviated from regular procedure in any way. The two cases simply are not fair congeners.

## C. Sentencing.

The defendant's last asseveration constitutes a challenge to his sentence on count 2 of the indictment. That count charged

-17-

him with possession of cocaine base with intent to distribute in violation of 21 U.S.C. § 841(a)(1). The defendant asserts that the district court erred in considering his prior criminal record when it imposed a ten-year, rather than a five-year, mandatory minimum sentence. See 21 U.S.C. § 841(b)(1)(B). This assertion rests on the premise that the fact of a prior conviction must be specified in the indictment, found by a jury beyond a reasonable doubt, or allocuted to during the change-of-plea colloquy (none of which happened here).

The defendant's premise is incorrect. The Supreme Court's decision in Almendarez-Torres v. United States, 523 U.S. 224 (1998), made clear that a sentence enhancement may be grounded on prior criminal convictions not separately charged, proven to a jury, or admitted by the accused. See id. at 226-27. While the Almendarez-Torres Court directed itself to prior convictions that triggered increases in the accused's maximum permissible sentence, see id. at 244-45, we have applied its reasoning with full force to prior convictions that trigger mandatory minimum terms of imprisonment, see, e.g., United States v. Roberson, ___ F.3d ___, ___n.11 (1st Cir. 2006) [2006 WL 2328586, at *14 n. 11]; United States v. McKenney, 450 F.3d 39, 45-46 (1st Cir. 2006).

As these cases illustrate, we have, even after the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), unhesitatingly affirmed our fealty to Almendarez-Torres.

-18-

See, e.g., Roberson, ___ F.3d at ___ n.11 [2006 WL 2328586, at *14 n.11]; United States v. Richards, 456 F.3d 260, 262 (1st Cir. 2006); United States v. Jiménez-Beltre, 440 F.3d 514, 520 (1st Cir. 2006) (en banc). We are bound to adhere to these precedents unless and until the Supreme Court itself disavows Almendarez-Torres. Accordingly, we hold that the district court acted appropriately in considering the defendant's criminal history in connection with the imposition of sentence.

## IV.  CONCLUSION

We need go no further.  Discerning no infirmity in the district court's disposition of the defendant's suppression motion, its regulation of cross-examination, or its imposition of sentence, we affirm the judgment below.

**Affirmed**.

-19-