CHAGARES, Circuit Judge,
concurring.
During a brief, fast-moving confrontation with an uneuffed, uncooperative, and possibly intoxicated Eugene Duncan, Trenton Detective Jason Astbury saw Duncan stuff a silver object into his jacket pocket. Astbury frisked the pocket and felt something hard and heavy. He then asked Duncan a single question — whether “it was a gun” in Duncan’s pocket — without first reciting Miranda warnings. Joint Appendix (JA) 129. Duncan’s answer established that indeed he had, hidden on his person, a .38 caliber five-shot revolver, fully loaded with hollow-point bullets. I believe Duncan’s answer falls squarely within the narrow “public safety” exception to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), established by New York v. Quarles, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). Therefore, although I agree with my learned colleagues’ conclusion that we should affirm the District Court’s Judgment and Commitment Order, I write separately because I do not believe that the application of Quarles here presents a “close case.”
I.
At approximately 11:00 p.m. on October 29, 2005, Detective Astbury and his partner, Detective Ryan Woodhead, of the Trenton Police Department’s Anti-Crime Unit were patrolling the area of Ardmore *607 and Farragut Avenues in an unmarked police car. The detectives knew from an informant that a drug dealer operated out of a house on Ardmore Avenue and also out of a brown Chevrolet Caprice that the dealer parked nearby. Driving up Ard-more Avenue, the detectives flipped on their car’s spotlight to illuminate the suspected drug house. No one was visible. As they turned the corner onto Farragut Avenue, they spotted the brown Caprice. It was empty. The police car crawled past the Caprice and the spotlight shone on Duncan, sitting in the driver’s seat of a red Chevrolet Beretta parked behind the Caprice. Duncan had a green glass bottle of Heineken beer raised to his lips.
When the light hit Duncan, he was “visibly startled. His eyes got big and he began to frantically move around inside the vehicle,” reaching down “toward the floor board.” JA 120, 123. Astbury stopped his car, intending to write Duncan a ticket for violating the Trenton ordinance against drinking alcohol in public. Ast-bury exited his vehicle and walked toward Duncan. As he closed from seven feet to three feet from the Beretta, Astbury saw something more than a relatively innocuous green bottle in Duncan’s hand: “[A]s I approached the car, I observed him with his right hand attempting to conceal a silver object in his right front [jacket] pocket.” JA 30. As he fumbled with the object, Duncan “was still visibly nervous, moving around a lot inside the vehicle.” JA 32.
Astbury believed — but “wasn’t 100 percent sure” — that the silver object was a gun. JA 50. Duncan succeeded in both shoving the object into his jacket pocket and hiding the beer, and his hands were now empty and in a position where Ast-bury could see them. Astbury told Duncan to stop moving and “to hand the beer over to me, and he cracked the door and handed me the beer.” JA 32. Astbury put the bottle on the Beretta’s roof. He then asked Duncan for identification, but did not ask him to get out of the car. Duncan did not follow this direction. Instead, without prompting, Duncan “stepped out of the vehicle and turned his back away from” Astbury. Id. After this unprompted maneuver, Duncan, who appeared to be “still nervous,” performed another unsettling act: he immediately “made a quick movement toward his right [jacket] pocket with his right hand [and] began to bend down towards the ground.” JA 126. Thinking that Duncan was reaching for the silver object, Astbury instantly grabbed Duncan’s arms and pulled them up onto the roof of the car. This did not end Duncan’s resistance, however, for Duncan pulled his arm down and again “reached towards his right jacket pocket with his right hand. This time he did not bend down towards the roadway, though.” JA 127. Again, to stop Duncan from grabbing whatever was in that pocket, Astbury grabbed Duncan’s arms and put them back on the roof of the car.
His suspicion now fully aroused, Astbury began a pat-frisk of Duncan’s right side— the area into which Duncan had placed the silver object, and the area that Duncan had just reached for, twice, against Ast-bury’s command. Astbury felt a “hard object” in the right jacket pocket. JA 34.
Immediately, Astbury grabbed Duncan’s arms, pulled them behind Duncan’s back, “and asked him if it was a gun in his pocket.” Id. Duncan replied, “yes, but it’s not my gun.” Id. Astbury posed no other questions.
Duncan’s demeanor now changed — he “gave up” and stopped resisting. Id. At this point, Astbury called out “301” to Woodhead, which is the Trenton Police Department’s radio code for “gun.”[5] Id. *608 at 34.
The entire interaction described above transpired in “less than two minutes.” JA 136. Astbury handcuffed Duncan, called for backup, and searched Duncan’s pockets. In the right pocket of Duncan’s jacket, Astbury found a silver-colored Taurus .38 caliber five-shot revolver. The gun was loaded to capacity with hollow-point bullets. Without being questioned further, Duncan repeated — approximately five times — that the gun was not his, that he had a story, and that the story was that he had borrowed the jacket from someone else. The officers placed Duncan into the back of their car and brought him to the police station.
On April 13, 2006, a grand jury indicted Duncan on one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) & (2). The District Court heard argument on and denied Duncan’s suppression motion on October 3, 2006, holding that the public safety exception applied to Duncan’s response to Detective Astbury, and that Duncan’s subsequent explanations were volunteered statements. Duncan’s trial began later that day, and on October 6, 2006, a jury found him guilty. On January 8, 2007, the District Court sentenced Duncan to 78 months imprisonment. This appeal followed.
II.
In Miranda, the Supreme Court found that certain procedures are necessary to protect an individual’s Fifth Amendment right to be free from compelled self-incrimination while subject to custodial interrogation.[6] See 384 U.S. at 468, 86 S.Ct. 1602. These procedures include the now-familiar requirement that a suspect be “Mirandized,” or, in other words, be
warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.
Id. at 479, 86 S.Ct. 1602. Without a “voluntary, knowing, and intelligent waiver” of these rights, police may not “question a suspect without counsel being present [nor] introduce at trial any statements made during the interrogation.” Alston v. Redman, 34 F.3d 1237, 1242 (3d Cir.1994).
In Quarles, however, the Supreme Court recognized that certain situations demand an exception to the Miranda rule, specifically where the safety of the public or the police is jeopardized. See 467 U.S. at 655-56, 104 S.Ct. 2626. In Quarles, a woman approached two police officers on patrol in Queens and said that a man had *609 raped her and then fled on foot into a supermarket. She gave a detailed description of the perpetrator and told the police that he was carrying a gun. The officers entered the supermarket and saw Quarles, who fit the description given by the victim. Quarles ran towards the back of the store. The police ran after, apprehended, and frisked him. Quarles was wearing an empty shoulder holster. An officer handcuffed him and, without giving Miranda warnings, “asked [Quarles] where the gun was.” Id. at 652, 104 S.Ct. 2626. Quarles nodded his head toward some empty liquid soap cartons and said, “the gun is over there.” Id. The officer searched the cartons and discovered a .38-caliber revolver. At that point, Quarles was notified that he was under arrest, and the police proceeded to give him Miranda warnings.
The Supreme Court reversed the state court’s suppression of Quarles’ statement that “the gun is over there.” The Court held that police officers may “ask questions reasonably prompted by a concern for the public safety” without first giving Miranda warnings. Id. at 656, 104 S.Ct. 2626. Moreover, the Court noted that the exception is applied using an objective, not a subjective, test, and therefore “the subjective motivation of the arresting officer” does not impact the reviewing court’s analysis. Id. at 656, 104 S.Ct. 2626. Instead, courts must focus on whether the situation presented an “objectively reasonable need to protect the police or the public from any immediate danger.” Id. at 659 n. 8, 104 S.Ct. 2626.
The Court applied what amounts to a cost-benefit analysis to the protection afforded by the Miranda warnings: where police conduct non-Mirandized questioning simply to “make [their] case” against a defendant, “whatever the cost to society in terms of fewer convictions of guilty subjects ... [will] simply have to be borne in the interest of enlarged protection for the Fifth Amendment privilege.” Id. at 656-57, 104 S.Ct. 2626. But where the police engage in custodial interrogation not to obtain testimonial evidence, because they “need [] answers to questions in a situation posing a threat to the public safety,” then this need “outweighs the need for the prophylactic rule protecting the Fifth Amendment’s privilege against self-incrimination.” Id. at 657, 104 S.Ct. 2626. The crucial distinction, which the Court believed police officers “will distinguish almost instinctively,” is “between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect.” Id. at 658-59, 104 S.Ct. 2626. The Court made clear, however, that it was recognizing only a “narrow exception to the Miranda rule,” one that in each case is “circumscribed by the exigency which justifies it.” Id. at 658, 104 S.Ct. 2626.
Application of Quarles in this case demands affirmance for two reasons. First, our facts are similar to those in Quarles itself, and the major factual discrepancy actually demonstrates a more dire exigency in the instant case. In Quarles, the police thought, but did not know, that they could be facing an armed man because of what the rape victim told them and because they saw that Quarles had an empty shoulder holster. Detective Astbury also believed, but “wasn’t 100 percent sure,” that he confronted an armed suspect based on his own observations of Duncan. JA 50. In each case, the officer asked just a single question, and in each case, the question was directed solely at establishing the presence of a firearm. Further, in both cases, immediately after the police located and neutralized the public safety threat, they ceased asking questions. In the words of Quarles, Detective Astbury, “in the very act of apprehending” Duncan, was “confronted with the immediate necessity of ascertaining the whereabouts of a gun *610 which” Astbury “had every reason to believe” Duncan had just placed into his pocket. 467 U.S. at 657, 104 S.Ct. 2626. “So long as the gun was concealed,” with its whereabouts unverified, “it obviously posed more than one danger to the public safety.”[7] Id.
The factual difference between this case and Quarles is that here, Astbury had seen what he thought was a gun, and there was only one place where he thought it could be. But this means that Duncan’s gun presented an even more immediate danger than did the one in Quarles. There, Quarles was handcuffed and surrounded by at least four officers at the time of questioning. Justice Rehnquist conceded that, on the facts, “there was nothing to suggest that any of the officers were any longer concerned for their own physical safety.” Quarles, 467 U.S. at 655, 104 S.Ct. 2626. Indeed, Justice Marshall based his dissent in part upon the remoteness of the threat: “As the other officers trained their guns on the suspect.... Officer Kraft then handcuffed Quarles, and the other officers holstered their guns. With Quarles’ hands manacled behind his back and the other officers standing close by, Officer Kraft questioned Quarles.” 467 U.S. at 674-75, 104 S.Ct. 2626 (Marshall, J., dissenting). Therefore, argued Justice Marshall, “[bjefore the interrogation began, Quarles had been reduced to a condition of physical powerlessness,” and the public safety risk was merely hypothetical. Id. at 675, 104 S.Ct. 2626 (Marshall, J., dissenting) (quotation marks and citations omitted). The majority in Quarles acknowledged that there was no precipitous threat; rather, the danger stemmed only from the possibility that “an accomplice might make use of [the gun, or that] a customer or employee might later come upon it.” Id. at 657,104 S.Ct. 2626.
Here, by contrast, only two officers were present, and Astbury testified that as he approached Duncan’s car, he could not see where Detective Woodhead was because he was “concentrating on Mr. Duncan’s actions.” JA 48. Unlike Quarles, Duncan was not handcuffed. Unlike the officers in Quarles, Astbury feared that Duncan had a gun on his person. Unlike Quarles, Duncan had not “been reduced to a condition of physical powerlessness,” since he twice reached for the exact pocket that Astbury thought contained a gun. In sum, the public safety risk posed by Duncan was not a matter of “might.” It was very real.
*611 Second, and more fundamentally, admitting Duncan’s response into evidence would accord with Quarles’ central holding: that the Miranda warnings are not required in the face of an “objectively reasonable need to protect the police or the public from any immediate danger associated with [a] weapon.” 467 U.S. at 659 n. 8, 104 S.Ct. 2626. So we must ask: did the totality of the circumstances create such an objectively reasonable need here? I believe the answer is clearly yes.
Consider what confronted Detective Ast-bury at the moment he asked his single question: (1) late at night, he saw Duncan drinking alcohol; (2) when illuminated by the police spotlight, Duncan became “visibly nervous” and began moving “frantically,” reaching around inside his car; (3) he saw Duncan stuff something that flashed silver into his right pocket; (4) he asked Duncan for identification, but instead of complying, Duncan exited the car and turned his back to Astbury; (5) Duncan was not handcuffed; (6) Astbury forced Duncan’s hands up onto the car’s roof to frisk him, but Duncan twice pulled his arms down and reached for the same pocket that contained the flash of silver; and (7) Astbury frisked that very pocket, and it contained something hard and heavy.
It was objectively reasonable to think that the totality of these circumstances created a threat to Astbury’s safety, to the safety of his partner, to the safety of Duncan, and to the safety of anyone living in the houses on Ardmore Avenue. Indeed, if Astbury had ignored the objectively reasonable threat posed by that hard, heavy flash of silver in Duncan’s pocket, and the gun had gone off, this panel could well be deciding a tort or civil rights action today.
III.
Each public safety case presents its own “kaleidoscopic situation,” with its own unique factual scenario. Quarles, 467 U.S. at 656, 104 S.Ct. 2626. Nonetheless, three factors are useful in determining whether or not the public safety exception applies. The first factor is the questions the police ask. Relevant here are how many questions were asked; the scope of these questions; and most importantly, the content— in other words, were the questions investigatory or safety-related. The second factor is what the police knew about the defendant at the time of the encounter. A court may thus consider facts such as whether the defendant is suspected of crimes involving weapons or violence; and whether the officers had any knowledge or belief as to the defendant’s potential dangerousness. The third factor examines the characteristics of the encounter: whether the defendant was handcuffed or otherwise secured; whether the defendant made furtive, irregular, or other disconcerting movements; and the general dangerousness of the atmosphere.
I am not suggesting that these three factors constitute a “test” to the exclusion of all other possible factors. Of course, the totality of the circumstances is the touchstone for any inquiry into the public safety exception’s applicability. But when examining the totality of the circumstances, these three factors are useful in analyzing whether the public safety exception should apply. In the instant case, all three factors point clearly to application of the public safety exception in this case.[8]
A.
The Supreme Court’s object in Miranda was to prohibit the authorities, when seeking to solve a crime, from using the coer *612 cion inherent in custodial interrogation to compel a suspect to incriminate himself. But the Quarles Court recognized that when faced with an “exigency requiring immediate action,” 467 U.S. at 659 n. 8,104 S.Ct. 2626, the police are not asking questions “designed solely to elicit testimonial evidence,” id. at 659, 104 S.Ct. 2626. Rather, when public safety is legitimately at risk, the police seek answers that will expose, and ehminate, the public safety threat. The purpose of the exception, of course, is to defuse dangerous situations, and the questions posed by the police must be geared toward that — and only that— goal. Such questions, “necessary to secure [the police’s] safety or the safety of the public,” are permissible under the Fifth Amendment. Id.
Thus, the first factor used to determine whether the public safety exception applies is the questions the police ask. Relevant here are the number of questions asked; the scope of the questions; and the content of the questions, in other words, whether they are safety-related (limited solely to gaining the information needed to ehminate the danger) or testimonial (geared towards solving a crime).
When an officer asks just one question directed at uncovering the threat and then stops, this factor weighs in favor of applying the public safety exception to the defendant’s answer. For example, in Quarles itself, the officer asked just a single question (where was the gun) before reciting Miranda warnings. Only after securing the gun and giving the warnings did the officer “continue[ ] with investigatory questions about the ownership and place of purchase of the gun.” Id. at 659, 104 S.Ct. 2626. This indicated that the officer’s question sought to eliminate a threat, not obtain evidence. See also United States v. Reilly, 224 F.3d 986, 993 (9th Cir.2000) (applying public safety exception in part because officer’s “inquiry was narrow, asking only a single question directed at determining the presence of [a] gun”); Carrillo, 16 F.3d at 1050 (applying public safety exception where even after defendant gave an incriminating response to single question, officer asked no more questions, since this “deliberate refusal to pursue the subject heightens our confidence that, in this case, the narrowly tailored question was a reasonable attempt by a police officer to ensure his personal safety in the midst of a search”).
Next, questioning with a limited scope— such as an inquiry that requires just a yes or no answer — points towards permitting the answer under the public safety exception. This was the case in Carrillo, where before frisking a drug dealer, an officer asked whether the dealer had any needles on him. 16 F.3d at 1049. The Quarles exception applied in part because of “the non-investigatory nature of the officer’s question. The question called for a ‘yes’ or ‘no,’ not a testimonial response. Ordinarily, a question framed in this manner would not elicit any incriminating evidence not produced by the search itself.”[9] 16 *613 F.3d at 1049-50; see also Allen v. Roe, 305 F.3d 1046, 1051 (9th Cir.2002) (applying exception in part because after locating gun, and thereby eliminating safety threat, officer did not ask defendant “any further questions after the gun was retrieved. The officer did not ask Allen ... any other questions regarding the crime.”)
Finally, there is a critical distinction between questions asked to defuse a dangerous encounter and questions that seek to solve a crime.[10] In Alien, for instance, an officer asked a man who had just shot his son at a campsite, and who had discarded the gun somewhere in the woods, to try and help the police find the gun. The Court of Appeals for the Ninth Circuit permitted the man’s answer in large part because “there was no indication that the officer’s questioning was intended to elicit incriminating evidence.... The questioning was limited to finding the gun and was not investigatory.” Id. at 1051 (citations omitted). Another example is Reilly, where the police arrested a defendant suspected of numerous robberies and armed carjackings, and asked him “[w]here is the gun.” 224 F.3d at 990. The Quarles exception applied because the question “b[ore] no indication of an attempt to elicit testimonial evidence.” Id. at 993. The inquiring officer “did not ask his question in an attempt to link Reilly to the bank robberies,” and although it “called for more than a simple ‘yes’ or Ino’ answer,” the question required “only the bare minimum necessary to locate and contain a potential threat.” Id.
Accordingly, answers to questions that are “narrow in scope, directly targeting the safety concern, and [] not posed to elicit incriminating evidence,” will often be permissible pursuant to the public safety exception. Estrada, 430 F.3d at 613 (permitting answers to several “focused” questions regarding whether guns were in the apartment of a known drug dealer, as “the questions were aimed at controlling a potentially dangerous situation and relieving an immediate threat to the officers’ safe *614 ty,” and not “a subterfuge for collecting evidence”); see also United States v. Brady, 819 F.2d 884, 888 (9th Cir.1987) (admitting answer to questions including “Do you have a gun?” because they were “not designed to elicit testimonial evidence. That is, they were not investigatory,” instead arising from officer’s “concern with public safety, his desire to obtain control of what could be a dangerous situation”).
Applying this first factor to the instant case leads to only one conclusion: Duncan’s statement in response to Detective Astbury’s question was well within the scope of the public safety exception.
First, Astbury posed only a single question. The question was nearly identical in form to those upheld by other courts, and numerous courts have held that even multiple questions can fall within the exception. See, e.g., Newsome, 475 F.3d at 1223; United States v. Fox, 393 F.3d 52, 56-57 (1st Cir.2004) (remanded for farther consideration in light of United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), by Fox v. United States, 545 U.S. 1125, 125 S.Ct. 2949, 162 L.Ed.2d 864 (2005), conviction and sentence upheld by United States v. Fox, 429 F.3d 316 (1st Cir.2005)); United States v. Newton, 369 F.3d 659, 663-64, 678-79 (2d Cir.2004); United States v. Khalil, 214 F.3d 111, 115 (2d Cir.2000); United States v. Kelly, 991 F.2d 1308, 1311 (7th Cir. 1993); Fleming v. Collins, 954 F.2d 1109, 1111 (5th Cir.1992) (en banc); Edwards, 885 F.2d at 384-85; Brady, 819 F.2d at 888.
Second, Astbury asked the most narrow kind of question possible, requiring only a “yes” or “no” answer. See Carrillo, 16 F.3d at 1049-50. Far broader questions, calling for more testimonial responses, have been upheld under Quarles. See, e.g., Newsome, 475 F.3d at 1223 (“anything or anyone in the room that [police] should know about”); United States v. Martinez, 406 F.3d 1160, 1163 (9th Cir.2005) (“what are those [weapons] doing there”); United States v. Luker, 395 F.3d 830, 832 (8th Cir.2005) (“if there was anything in Luker’s vehicle that shouldn’t be there or that [the police] should know about”); Newton, 369 F.3d at 663 (inquiry regarding “contraband”); Williams, 181 F.3d at 953 (“is there anything we need to be aware of’); Fleming, 954 F.2d at 1111 (“[w]ho shot you,” “[w]ho was with you,” “[w]here is the gun”); United States v. Knox, 950 F.2d 516, 517 (8th Cir.1991) (“where [is] the gun”); United States v. Padilla, 819 F.2d 952, 960 (10th Cir.1987) (“whether defendant was okay” and “how about inside the house”).
Third, Astbury’s question was in no way investigatory. As soon as Duncan answered the one question posed, Astbury stopped his questioning immediately. He did not ask why Duncan had the gun; he did not ask whether Duncan had a permit for the gun; he did not ask whether Duncan owned the gun; he did not ask whether Duncan had been previously convicted of a crime; he did not ask anything else. In Quarles, “Officer Kraft asked only the question necessary to locate the missing gun before advising [Quarles] of his rights,” which demonstrated to the Court that the question was necessary to secure the public safety, and not to further the investigation. 467 U.S. at 659, 104 S.Ct. 2626. Similarly, Astbury’s “disinclination to exploit the situation suggests that his question was a reasonable attempt to ‘insure his personal safety in the midst of a search.’ ” Reyes, 353 F.3d at 154-55 (quoting Carrillo, 16 F.3d at 1050). The narrow scope of Astbury’s single question, which he did not follow with any other inquiries, indicates an attempt to dispel an immediate threat, not an effort to obtain incriminating evidence.
*615 For these reasons, the first factor used to assess the public safety doctrine weighs strongly in favor of applying it here.
B.
The second factor is what the police knew about the defendant at the time of the encounter. A court’s analysis of this factor compels consideration of two subsidiary questions: (1) whether the defendant is suspected of inherently violent crimes; and (2) whether the police have reason to think that the particular defendant is potentially dangerous. If the answers to either of these questions are in the affirmative, then this factor favors employing the public safety exception. In other words, if the police have such knowledge, the exception permits them “to follow their legitimate instincts when confronting situations presenting a danger to the public safety.” [11] Quarles, 467 U.S. at 659, 104 S.Ct. 2626.
First, the type of crime attributed to the suspect impacts our analysis of whether the public safety exception applies. Specifically, when an individual is suspected of a crime that typically involves weapons or violence — such as illegal gun possession, murder, rape, robbery, assault, or bank robbery — such potential dangerousness can factor into the objective reasonableness of questions asked before provision of Miranda warnings, and it is more likely that the public safety exception will permit admission of answers to an officer’s questions regarding the presence of any weapons. See, e.g., Williams, 483 F.3d at 429 (“it may be objectively reasonable to believe that Williams had a weapon in his apartment based solely on the violent crimes that he allegedly had committed, aggravated rape and aggravated robbery”); Estrada, 430 F.3d at 613 (observing that where arresting officers knew that defendant had convictions for assault, they “had an objectively reasonable need to protect themselves from immediate danger” because “considering [defendant’s] assault convictions, the officers had reason to believe that [he] was capable of violence”); United States v. Shea, 150 F.3d 44, 48 (1st Cir.1998) (affirming admissibility of defendant’s answer to question “whether he had any weapons” in part because “the agent had just apprehended an individual suspected of attempting to commit a violent crime, armed bank robbery”) (recognized as abrogated on other grounds by United States v. Mojica-Baez, 229 F.3d 292, 310 (1st Cir.2000)).
Thus, the police may generalize about individuals suspected of certain kinds of crimes, and the public safety threats that those types of individuals typically present, because of the presumption that individu- *616 ais suspected of violent crimes may well present a danger to public safety.[12]
Second, if the police know of a specific threat posed by a particular suspect, that knowledge can make a police officer’s decision to ask questions without warnings more objectively reasonable. In Quarles itself, the victim told the police that she had just been raped — an inherently violent crime — and that the defendant was carrying a gun, and so was potentially dangerous. See 467 U.S. at 651-52, 104 S.Ct. 2626. This knowledge permitted the police to “neutralize the volatile situation” they confronted by asking the defendant non-Mirandized questions. Id. at 658, 104 S.Ct. 2626.
Newton is another good example of a case where officers’ knowledge of a specific defendant’s potential dangerousness factored into the court’s public safety analysis. Newton lived with his mother after being paroled. Newton’s mother contacted the authorities, claiming that Newton had threatened to kill her and her husband, and that Newton kept a gun in a shoe box by the door. Six officers went to the residence, and when Newton answered the door in his underwear, the officers told him to step into the hallway. They handcuffed him. An officer asked Newton whether he had any contraband, and Newton replied, “only what is in the [shoe] box.” Newton, 369 F.3d at 664. The officer asked what was in the box, and Newton replied “a two and two.” Id. The Court of Appeals for the Second Circuit held that the public safety exception applied, in large part because
the officers who went to the apartment to perform the search knew that [Newton’s mother] had recently reported both her son’s possession of a firearm in their home and his threats to kill her and her husband. This information supported an objectively reasonable belief that Newton was dangerous, that he and his family were involved in a volatile domestic dispute, and that, until the gun was found, there was a serious and immediate risk of harm to anyone in the apartment.
Id. at 678; see also Newsome, 475 F.3d at 1223, 1225 (applying Quarles exception where police, knowing that Newsome was suspected of a shooting, handcuffed him *617 and asked if there was “anything or anyone in the room that [he] should know about,” because “the officers knew that they were dealing with a possibly armed, violent felon,” and so “[t]he officers reasonably believed that they were in danger, and they acted accordingly to protect themselves ... in making the arrest”); Martinez, 406 F.3d at 1162, 1165-66 (applying exception when officer, answering a domestic violence call complaining of an “out of control” man at the house, recognized the address as one to which he had previously been sent on a domestic violence incident); Reyes, 353 F.3d at 154 (finding important that officers knew defendant was often armed in reversing District Court’s suppression of defendant’s response that he had a gun, as “the arresting officer here had an objectively reasonable belief that Reyes ... [had] a firearm on his person” because “[t]he officers [had] a solid basis for the belief that Reyes was armed and that the concealed weapon posed a danger to the police and to the public”).
In Quarles and other cases, third parties provided the police with knowledge of a possible public safety threat. But perhaps even more relevant is a police officer’s suspicion concerning a particular suspect based on the officer’s personal observations. For example, in Kelly, an officer stopped Kelly for speeding, and noticed alcohol bottles and drug paraphernalia in Kelly’s car. See 991 F.2d at 1310-11. When the officer asked to search him, Kelly reached into his pocket and “pulled out a fistful of change which contained several .22 caliber cartridges.” Id. at 1311. This display concerned the officer, and so he “asked Kelly if he had a gun.” Id. When Kelly did not answer, the officer “asked if the gun was in the trunk,” to which Kelly replied that the gun was “on me.” Id. Although the Court of Appeals for the Seventh Circuit disposed of the case by holding that Kelly was not in custody for Fifth Amendment purposes, it observed that “once Kelly produced the .22 cartridges in response to Dixon’s query about drugs, Dixon was permitted to pursue the question of the location of the gun under the public safety exception.” Id. at 1313.
Similarly, in Knox, the police knew from their interactions with the suspect that he was potentially dangerous. See 950 F.2d at 517. There, the police noticed an empty car with its engine running, with footprints in the snow leading to a nearby building. They saw Knox and a woman exit the building and questioned Knox, who acted nervously. One officer “conducted a pat search, felt something resembling a knife in a jacket pocket, and reached inside where he found a loaded magazine for a .38-caliber pistol” and drugs. Id. After arresting Knox, “[t]he officers asked him where the gun was, and he told them it was under the front seat of his car, where they retrieved it.” Id. The Court of Appeals for the Eighth Circuit affirmed the district court’s refusal to suppress the gun, holding that “public safety concerns were present here. Knox was carrying cocaine and a loaded magazine but no gun. The police were justified in making an immediate attempt to locate the gun to eliminate this danger to themselves and to others in the area.”[13] Id. at 519.
*618 On our facts, Astbury knew more about Duncan’s potential dangerousness than did the police in many cases that have applied the public safety exception based at least in part on the police’s knowledge of potential dangerousness. First, of course, Ast-bury had greater reason to fear Duncan than did the police in any of the cases cited above that permitted answers to public safety questions based solely on the fact that the defendant was suspected of a crime involving guns or violence. In such cases, the police do not know that the specific person they confront is dangerous — that there will in fact be a public safety threat — but only that a certain category of suspect is often dangerous. See e.g., Williams, 483 F.3d 425, 429; Estrada, 430 F.3d at 613; Luker, 395 F.3d at 833-34; Shea, 150 F.3d at 48; Carrillo, 16 F.3d at 1049; Edwards, 885 F.2d at 384. Here, by contrast, Astbury knew that Duncan, specifically, could be dangerous because Astbury personally observed Duncan with a silver object that might have been a gun.
Further, Astbury had more direct knowledge that Duncan could pose a threat to him and his partner than the cases cited above where the police’s information regarding dangerousness came from third parties. See Quarles, 467 U.S. at 651-52, 104 S.Ct. 2626; Newsome, 475 F.3d at 1222-23; Martinez, 406 F.3d at 1165; Newton, 369 F.3d at 678; Reyes, 353 F.3d at 150. But all of these decisions, too, permitted admission of answers to public safety questions due, in part, to the police’s second-hand knowledge that the defendant could be dangerous.
Here, however, Astbury relied upon his own personal observations of Duncan, as did the police in Knox and Kelly. The courts in both of those cases held that the public safety exception applied, in part because when officers learn of the defendants’ dangerousness from their own observations, this favors application of the public safety exception. In Kelly, once the officer saw the .22 caliber cartridges among a handful of change, he “was permitted to pursue the question of the location of the gun under the public safety exception.” 991 F.2d at 1313. In Knox, once the officer first felt and then retrieved the magazine, “the police questioning was lawful under the public safety exception.” 950 F.2d at 519.
Just as in Knox and Kelly, Detective Astbury had an objectively reasonable basis to fear Duncan based on what Astbury observed personally during the fast-moving encounter. Astbury had come upon a man drinking alcohol who, when spotted by the police, began moving “frantically” around inside his car. JA 120. From less than seven feet away, Astbury saw Duncan “attempting to conceal a silver object in his right front pocket.” JA 30. Ast-bury believed the object was a gun. His pat-frisk of Duncan’s right pocket, revealing a hard, heavy object, strengthened his suspicions — but did not confirm them. See JA 50 (Astbury “wasn’t 100 percent sure” that Duncan’s silver object was a gun). To eliminate the uncertainty in this brief and volatile confrontation, Astbury asked if the object in the pocket was a gun. In this situation, the second factor— what Astbury knew of Duncan’s potential dangerousness — strongly supports admitting in evidence Duncan’s answer to Ash-bury's question pursuant to the public safety exception.
*619 c.
The third factor is the characteristics of the encounter between the police and the suspect. As the Court of Appeals for the Fifth Circuit has observed, “the public safety exception should be virtually intuitively comprehensible to police officers. When the danger inherent in a confrontation has passed, so has the basis for the exception.” Fleming, 954 F.2d at 1114. Accordingly, relevant inquiries include whether the suspect was handcuffed or otherwise secured; whether the suspect made furtive, irregular, or disconcerting movements; and the general dangerousness of the atmosphere.
Duncan was not handcuffed but rather was only being held by Astbury. Numerous courts have held that the answers of far more subdued defendants were properly admitted pursuant to the public safety exception. Indeed, many courts have held that even where a defendant is handcuffed, the public safety exception can apply. Remember that in Quarles itself, the defendant was handcuffed when questioned. See 467 U.S. at 655, 104 S.Ct. 2626. The Court decided, however, that the danger to unsuspecting civilians sufficed to apply the exception. Id. at 657, 104 S.Ct. 2626; see also United States v. Liddell, 517 F.3d 1007, 1008 (8th Cir.2008) (applying exception when after defendant was removed from his car, arrested, handcuffed, and put in back of police car, police found an unloaded gun under front seat and then asked whether there was “anything else in [the car] we need to know about”); New-some, 475 F.3d at 1225 (determining that exception applied where defendant was handcuffed on floor because “officers reasonably believed that they were in danger”); Luker, 395 F.3d at 835 (applying exception where defendant had already been arrested, handcuffed, and patted down); Newton, 369 F.3d at 678 (holding that public safety issue remained notwithstanding that Newton was handcuffed and in hallway outside his apartment because “the unlocated gun presented a deadly risk to everyone on the premises”); Lackey, 334 F.3d at 1225-27 (finding “a real and substantial risk to the safety of the officers and Defendant” after defendant was handcuffed and led away from his car); Williams, 181 F.3d at 948, 950, 953-54 (permitting answer to question posed to a “frail and elderly looking” defendant handcuffed and lying in bed).
As even a handcuffed defendant can pose a threat to an officer’s safety, an uncuffed defendant poses a particularly acute danger. For example, in Reyes, the police had apprehended, but not yet handcuffed, Reyes when they asked him questions before reciting the Miranda warnings. See 353 F.3d at 154. The police knew that Reyes was often armed, and therefore “there was a risk that Reyes was carrying a loaded gun that could accidentally be discharged during a search.” Id. Combined with the fact that Reyes “was not yet handcuffed” and so “still could have reached for a concealed weapon,” the Court of Appeals for the Second Circuit held that “[t]he officers had a solid basis for the belief that ... the concealed weapon posed a danger to the police and to the public.”[14] Id.
*620 The situation posed by Reyes is exactly the situation here. Just as in Reyes, Duncan was not yet handcuffed. Just as in Reyes, Astbury had a “solid basis for the belief’ that Duncan well might be armed. Just as in Reyes, Duncan “still could have reached for a concealed weapon,” and indeed Duncan twice made movements towards exactly the area where the weapon was later found. Accordingly, just as in Reyes, Astbury “had a solid basis for the belief that ... the concealed weapon posed a danger to the police and to the public.” 353 F.3d at 154.
The next inquiry examines a defendant’s furtive, irregular, or disconcerting movements, which can heighten the safety threat to officers and strengthen the applicability of the Quarles exception. The situation in Fox was similar to our own. 393 F.3d 52. After stopping Fox’s car for a traffic violation, the officer activated his car’s spotlight and “observed that Fox, the vehicle’s sole occupant, “was moving around ... more than ... normal for an average traffic stop.’ He also saw Fox make a ducking motion, as if ‘reaching for something under the seat or placing something under the seat.’ ” Fox, 393 F.3d at 56 (ellipses in original). The officer exited his vehicle and recognized Fox as someone he had previously arrested for firearm possession. The officer “then noticed a large bulge in Fox’s left inside jacket pocket,” and ordered Fox to exit the vehicle. Id. A frisk revealed brass knuckles and an unused shotgun shell on Fox’s person. The officer then asked Fox, without providing Miranda warnings, to locate the gun that went with the shell. This questioning led to the discovery of a shotgun in Fox’s car. The Court of Appeals for the First Circuit upheld the district court’s denial of Fox’s suppression motion because “[ujnder the circumstances, [the officer] was permitted to ask Fox whether he possessed any weapons.... Having found the live shell and realized that he had previously arrested Fox for possessing a firearm, [the officer] had ample reason to fear for his own safety and that of the public.” Id. (citation omitted).
In Reilly, too, the defendant’s furtive movements factored into the court’s decision to apply the public safety exception. See 224 F.3d 986. The police learned that Reilly, a suspect in dozens of bank robberies and an armed carjacking, was staying in a motel room. Five officers burst into the room, three .with guns drawn, and ordered Reilly to he face-down on the floor. Reilly complied, but as one agent approached to handcuff him, Reilly “began to bring his arms to his front waistband, and the agents told him to reposition his arms, which he did.” Id. at 990. One agent then asked Reilly, “Where is the gun?” to which Reilly replied that it was in a black bag in the bedroom. Id. The Court of Appeals for the Ninth Circuit affirmed the district court’s denial of Reilly’s motion to suppress. The officer asked about the gun “only after Reilly started to bring his hands to his waistband, a place where weapons are frequently concealed. The officers had no idea whether Reilly was armed or not, and this suspicious move reasonably caused Agent Johnson to fear that Reilly might be reaching for a weapon.” Id. at 993. The Court concluded that “[t]here was an objectively reasonable need on the part of the officers to protect themselves given the volatility of the situation with which they were faced.” Id.; see also Williams, 483 F.3d at 428 (holding that public safety exception applies “if and only if’ two conditions are satisfied: “(1) *621 that the defendant might have (or recently have had) a weapon, and (2) that someone other than police might gain access to that weapon and inflict harm with it,” and that while second prong would not apply, for instance, if the police entered a defendant’s room, handcuffed him, and placed him on a chair in the hallway outside his room, it might apply if defendant was “unrestrained and had turned back into his room to retrieve his identification” when questioned by the police).
Comparing Fox and Reilly to our case leads to the inescapable conclusion that the third factor favors applying the public safety exception to Duncan’s answer to Astbury’s question. Exactly as in Fox, when Astbury’s spotlight first hit him Duncan began “ ‘moving around ... more than ... normal for an average traffic stop,’ ” and “ducking [down], as if ‘reaching for something under the seat or placing something under the seat.’ ” 393 F.3d at 56 (ellipses in original). Duncan then exited his car against Astbury’s instructions. Once out of the car, he twice wrestled his arms down from the roof of the car and moved for his right jacket pocket, the area that Astbury believed contained a gun. All of this took place within the span of “less than two minutes.” JA136.
Accordingly, as in Fox and Reilly, Duncan made fast and worrisome movements both while inside and after exiting his car. And as in Reilly, Astbury asked his question only after Duncan reached twice for his pocket, “a place where weapons are frequently concealed,” and the place where Astbury in fact had reason to think that Duncan had a weapon concealed. 224 F.3d at 993. Thus, “this suspicious move reasonably caused [Astbury] to fear that [Duncan] might be reaching for a weapon.” Id.
For all these reasons, I believe that the characteristics of the encounter between Astbury and Duncan favor admitting Duncan’s answer pursuant to the public safety exception.
IV.
The majority is absolutely correct when they note that Quarles created only a “narrow exception” to the rule of Miranda. 467 U.S. at 658, 104 S.Ct. 2626. Nonetheless, I believe Duncan’s statement should not be suppressed because the totality of the facts and circumstances here clearly caused Astbury to have an objectively reasonable fear for his safety. Again, I believe that the following factors may be considered in examining the totality of the circumstances to determine whether the public safety exception should apply: first, what questions the police ask, including the number, scope, and purpose (investigatory or safety-related); second, what the police knew about the defendant at the time of the encounter, including whether the defendant was suspected of a crime involving weapons or violence and whether the police had information that the defendant was potentially dangerous; and third, the characteristics of the encounter: whether the defendant was handcuffed or otherwise secured, whether the defendant made furtive, irregular, or disconcerting movements, and how dangerous the atmosphere appeared.
For the reasons set forth above, I respectfully concur with the majority’s opinion.

. He used a code, instead of simply saying "gun,” because often "if you say gun, some *608 body who has a gun, it may startle them, may think that we’re trying to get that gun off of them, make them more nervous and make the situation even worse." JA 130. On the other hand, “if somebody who has a gun knows that the police know [they] have a gun ... it makes the situation a little bit easier.” JA 129. In addition, "if I know it’s a gun, I can go inside of his pocket more carefully and get it out rather than just going in there and not knowing what it is.” JA 129-30.

. Warnings pursuant to Miranda are required only if a suspect is both in custody and subject to interrogation. Here, the parties agree that Duncan was subject to custodial interrogation. Duncan was in custody for Fifth Amendment purposes because Astbury was attempting to restrain Duncan while frisking him. See California v. Beheler, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (holding that Fifth Amendment custody is a "restraint on freedom of movement of the degree associated with a formal arrest”) (quotation marks omitted). Astbury's question was interrogation because, if answered in the affirmative, it was likely to elicit an incriminating response. See Rhode Island v. Innis, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

. Duncan attempts to distinguish this case from Quarles on the theory that “there could have been no legitimate concern for the public’s safety in general because no members of the public were present.” (Duncan Br. at 27.) Although the majority does not address this point, it need not detain us long because Quarles itself rejects Duncan’s contention. See 467 U.S. at 658-59, 104 S.Ct. 2626 (describing scope of the public safety exception as encompassing "questions necessary to secure their own safety or the safety of the public”) (emphasis added). This, of course, makes perfect sense — police officers’ lives are not to be sacrificed at the altar of the Fifth Amendment.
Several courts of appeals have come to the identical conclusion, reinforcing the settled point that the public safety exception covers questions designed to secure the safety of police officers. See, e.g., United States v. Estrada, 430 F.3d 606, 612 (2d Cir.2005) (noting that “the public safety exception clearly encompasses questions necessary to secure the safety of police officers”); United States v. Reyes, 353 F.3d 148, 154-55 (2d Cir.2003); United States v. Lackey, 334 F.3d 1224, 1227-28 (10th Cir.2003) (stating that “the concern of the public-safety doctrine extends beyond safety to civilians. The exception undoubtedly extends to officers’ questions necessary to secure their own safety.”) (quotation marks omitted); United States v. Carrillo, 16 F.3d 1046, 1050 (9th Cir.1994); United States v. Edwards, 885 F.2d 377, 384 n. 4 (7th Cir. 1989); United States v. DeSantis, 870 F.2d 536, 539 (9th Cir.1989).

. Our Court has never dealt squarely with the public safety exception. Only United States v. DeSumma, 272 F.3d 176 (3d Cir.2001), discusses the doctrine in any detail, and does so only in dicta.

. It follows that, generally, the more questions asked by the police, and the broader their scope, the less likely the public safety exception should apply. This is not to say, however, that only the narrowest possible question will be permitted, as courts have recognized universally that "public safety questions are framed spontaneously in dangerous situations. Precision crafting cannot be expected in such circumstances.” Newton, 369 F.3d at 678 (finding permissible question inquiring whether there was any "contraband” — not simply a firearm — in defendant's home). Thus, questions "need not be posed as narrowly as possible ... in the circumstances of a tense and dangerous arrest.” Estrada, 430 F.3d at 612. Accordingly, "a question that plainly encompasses safety concerns, but is broad enough to elicit other information, does not necessarily prevent application of the public safety exception when safety is at issue and context makes clear that the question primarily involves safety.” Id.; *613 see also United States v. Newsome, 475 F.3d 1221, 1223, 1225 (11th Cir.2007) (permitting question with "broad phrasing” — whether there was "anything or anyone in the room that [police] should know about” — because "[t]he officer asked what was necessary to secure the scene.... An officer is not expected to craft a perfect question in the heat of the moment.”); United States v. Williams, 181 F.3d 945, 954 n. 13 (8th Cir.1999) (permitting answer to question "is there anything we need to be aware of,” even though "the officer did not specifically refer to weapons or safety concerns,” because “conditioning admissibility of evidence under the public safety exception on an officer’s ability to ask questions in a specific form would run counter to” exception’s purpose). \

. We must also recognize why this inquiry does not run afoul of the Quarles Court’s admonishment that the officer’s subjective intent is irrelevant. As the Court of Appeals for the Sixth Circuit has explained:
[t]hough evidence of pretext[ual questioning asked only to obtain testimonial evidence] goes most directly to the officer's subjective beliefs (rather than the objective reasonableness of those beliefs), we consider such evidence to the extent that it informs our understanding of the objective circumstances. Generally, the fact that an officer was willing to manipulate the scene of an arrest in order to gather evidence makes it unlikely that he could have formed an objectively reasonable belief that he was in danger.
United States v. Williams, 483 F.3d 425, 429-30 (6th Cir.2007). Thus, courts may consider an officer's questions not to determine the subjective intent of the officer, but rather to examine the objective reasonableness of the officer’s belief that he or she confronted an imminently dangerous situation. If an officer has the time to ask questions that seek to solve a crime, and not just to eliminate a safety threat, then this fact may tend to demonstrate that there was no "objectively reasonable need to protect the police or the public.” Quarles, 467 U.S. at 659 n. 8, 104 S.Ct. 2626.

. It is true that the public safety exception is applied using a standard of objective reasonableness. See Quarles, 467 U.S. at 656, 104 S.Ct. 2626. This is because in fast-moving, dangerous situations, "spontaneity rather than adherence to a police manual is necessarily the order of the day,” and therefore "the application of the exception ... should not be made to depend on post hoc findings at a suppression hearing concerning the subjective motivation of the arresting officer.” Id.-, see also United States v. Holt, 264 F.3d 1215, 1225-26 (10th Cir.2001) ("That one officer is braver (or more foolhardy) than another, and therefore not subjectively concerned for his or her safety, should not deprive that particular officer of a right to protect his or her safety. Even the brave officer should be allowed to minimize the ever-present risk of being attacked or killed.”). Accordingly, courts are not to enter the mind of the arresting officer and assess the officer's intention when asking the challenged questions. But we must distinguish this prohibition from a related inquiry that is wholly proper: what the officers knew about the defendant when they confronted one another. What the police officers knew is essential to determining whether their actions were objectively reasonable, and does not overlap with their subjective reasons for asking their questions.

. Indeed, at least four courts of appeals have held admissible, pursuant to the public safety exception, answers to questions commonly posed to suspected drug users and dealers— such as whether they possess guns or needles — even without any specific, articulable fear of the particular suspect. See Estrada, 430 F.3d at 613 (determining that police’s knowledge that suspect kept drugs in apartment "gave rise to a reasonable belief that he also kept a gun there. We have often recognized that firearms are tools of the drug trade that are commonly kept on the premises of major narcotics dealers.”); Luker, 395 F.3d at 833-34 (permitting defendant’s admission that a shotgun was in his car because officers "were aware of Luker's history of methamphetamine use”); Carrillo, 16 F.3d at 1049 (concluding that public safety exception permitted admission of answer to question whether suspect had any needles or drugs on him because officer’s question "stemmed from an objectively reasonable need to protect himself from immediate danger,” and even though "[t]he risk [of avoiding contact with syringes and toxic substances] differs from that presented by a gun, [] the danger of transmission of disease or contact with harmful substances is real and serious enough; a pressing need for haste is not essential”); Edwards, 885 F.2d at 380, 384, 384 n. 4 (affirming admission of answers to several questions, including presence of gun, posed to handcuffed suspected drug dealer, because "drug dealers are known to arm themselves, particularly when making a sale,” and thus officer had "an objectively reasonable need to protect himself, his partner, and the public [] from the immediate danger that a weapon would pose”); see also United States v. Webster, 162 F.3d 308, 332 (5th Cir.1998) (affirming admission of incriminating answer to question whether defendant had any needles in his pockets).

. None of the above discussion is intended to imply that evidence of a defendant’s dangerousness is required to apply the exception. At least two courts have held that even where the police have no knowledge that a weapon might be present — from any source — the exception can nevertheless apply. See United States v. DeSantis, 870 F.2d 536, 539 (9th Cir. 1989) (affirming under Quarles admission that gun was in closet where defendant, served with arrest warrant at home, asked if he could go to the bedroom to change his clothes, and officer asked him "whether there were any weapons in the bedroom.” The Court of Appeals for the Ninth Circuit held that it was "of no consequence” that "the *618 inspectors had no reason to suspect that a gun might be present and had no reason to fear DeSantis.”); Brady, 819 F.2d at 888 (where a potentially unstable crowd had gathered at the arrest scene, exception applied notwithstanding that police had no “reason to believe that Brady had disposed of a gun in a place where it posed an immediate public danger,” and that in fact "[tjhere was no [] indication that Brady possessed a weapon”).

. Indeed, when the defendant is not yet handcuffed, even when the situation is seemingly very secure, courts have applied the public safety exception. See, e.g., Padilla, 819 F.2d at 960 (applying exception where, after receiving report of a man firing shots, police confronted defendant, ordered him to drop his weapon, made him lie on his stomach spread-eagle, and then asked him questions); Estrada, 430 F.3d at 608-09, 613-14 (applying exception where defendant was lying face-down on the floor, with one officer standing over and attempting to handcuff him, when another officer asked about weapons in the apartment); Reilly, 224 F.3d at 993 (upholding question "where is the gun” posed to suspect who was subdued and surrounded by police with weapons drawn, in part because *620 defendant "was not yet handcuffed and still had the capacity to reach and grab any nearby objects”).